United States District Court
Southern District of Texas
**ENTERED**
December 23, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ClearChoice Holdings, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-14-03569 |
| | § | |
| Clear Choice Dental, PLLC, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION**

Pending before the court[1] is Plaintiff's Motion for Default Judgment. The court has considered the motion, the briefs, all other relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **GRANTED**.

## I.  Case Background

Plaintiff filed this action bringing claims under federal law for trademark infringement, false designation of origin, trademark dilution, unfair competition, and cyberpiracy. Plaintiff also made claims of common law trademark infringement and unfair competition under Texas law.

### A.  **Factual Background**

ClearChoice Holdings, LLC ("Plaintiff") owns ClearChoice Management Services, LLC that administratively supports the

---

[1]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 29, Ord. Dated March 4, 2016.

ClearChoice Dental Implant Centers.[2]   The ClearChoice Dental Implant Centers are independently owned by licensed dental professionals and provide dental implant services to patients.[3] ClearChoice opened its first Texas location in August 2006, and a Houston location followed in 2010.[4]   As of the filing of the complaint, there were ClearChoice offices in Houston and The Woodlands.[5]

ClearChoice Dental Implant Centers license "trademarks, logos, service marks, and other copyrighted materials" from Plaintiff.[6] Plaintiff owns four federally registered trademarks for: CLEARCHOICE DENTAL IMPLANTS (2005); CLEARCHOICE DENTAL IMPLANT CENTER (2008); THE CLEARCHOICE EXPERIENCE (2009); and CLEARCHOICE (2013).[7]

Dr. Mary Karen Matt ("Dr. Matt") operated her dentistry practice under the name of Clear Choice Dental, PLLC ("Defendant") in Bellaire, Texas, her only location.[8]   Defendant was formed on July 21, 2010, upon the filing of a Certificate of Formation with

---

[2]     See Sealed Doc. 27, Decl. of Jason C. Langley ¶ 3.

[3]     See id.

[4]     See id. ¶ 4.

[5]     See id.

[6]     Id.

[7]     See id. ¶ 6(a)-(d); Sealed Doc. 27, Exs. 1-4 to Decl. of Jason Langley.

[8]     See id. ¶ 19.

the Secretary of State.[9]   Until October 9, 2015, Defendant maintained a website using the domain name "myclearchoicedental.com."[10]  According to this website, Defendant offered a "full range of dental services, including implants, dentures, bridges, crowns, inlays and onlays, periodontics, and teeth whitening."[11]

Defendant registered a new domain name, "dentalassociatesoftexas.com," on October 9, 2015.[12]  However, as of February 17, 2016, Defendant continued to be listed on other websites such as Facebook, Yelp, and Angie's List as Clear Choice Dental, PLLC, not Dental Associates of Texas.[13]

**B.**   **Procedural Background**

Plaintiff filed this action on December 15, 2014.[14]  Defendant filed an answer on February 13, 2015.[15]   The docket control order was entered on May 1, 2015, with the discovery deadline set for December 18, 2015.[16]  Defendant's attorney withdrew from the case on June 15, 2015, explaining that Defendant was unresponsive to the

---

[9]    See Sealed Doc. 27, Decl. of Jason C. Langley ¶ 20.

[10]   Id. ¶ 21.

[11]   See id.

[12]   Id.

[13]   See id.

[14]   See Doc. 1, Pl.'s Compl.

[15]   See Doc. 7, Def.'s Ans.

[16]   See Doc. 11, Docket Control Ord. Dated May 1, 2015.

attorney's communications.[17]  In the motion to withdraw, Defendant's counsel stated that Defendant was considering hiring another attorney.[18]

On November 6, 2015, Plaintiff filed a motion to strike Defendant's answer and for entry of default.[19]  Plaintiff argued that Defendant could not continue to proceed without counsel because, as it was a professional limited liability corporation, the law required such an entity to be represented by counsel.[20]  On December 7, 2015, the court struck Defendant's answer and gave Defendant until December 30, 2015, to file a new answer through an attorney.[21]  Defendant failed to act, and default was entered on January 6, 2016; Plaintiff was ordered to file for a default judgment within twenty days.[22]  Plaintiff filed a motion to extend this deadline in order to pursue settlement discussions.[23]  These

---

[17]    See Doc. 12, Def. Counsel's Unopposed Mot. to Withdraw as Counsel for Def. ("The inability of Harris Hilburn, LLP to meaningfully communicate with Clear Choice Dental, PLLC makes continued representation not feasible.  Dr. MaryKaren Matt, the registered agent and managing member/owner of Clear Choice Dental, PLLC, has been uncooperative in assisting Harris Hilburn, LLP prepare the necessary legal defense to the claims presented against Clear Choice Dental, PLLC.  Dr. Matt has not responded  to letters and phone calls to her office requesting her to communicate with Harris Hilburn LLP and participate in developing the defense of the allegations asserted in this litigation."); Doc. 13, Ord. Dated June 15, 2016.

[18]    See id. ¶ 15.

[19]    See Doc. 19, Pl.'s Mot. to Strike Ans. & for Clerk's Entry of Default Against Def.

[20]    See id. p. 2.

[21]    See Doc. 20, Ord. Dated Dec. 7, 2015.

[22]    See Doc. 21, Ord. Dated Jan. 6, 2016.

[23]    See Doc. 22, Pl.'s Mot. to Extend Deadline p. 1.

discussions were not fruitful, and on February 16, 2016, Plaintiff filed a motion for leave to file its damages calculation under seal, which the court granted on February 17, 2016.[24]  The sealed document is a declaration of Jason C. Langley ("Langley") explaining Plaintiff's damages.[25]

On March 3, 2016, Plaintiff and Defendant filed a joint status report with the court.[26]  In this report, Plaintiff argued that the court should not hold a hearing on the issue of damages, and that the court should enter the default judgement and award damages based on the Langley declaration.[27]  Defendant argued that it should have proper service of the Langley declaration so it could oppose Plaintiff's claims for damages.[28]  Furthermore, Defendant sought a hearing from the court on the issue of damages.[29]  On September 14, 2016, the court ordered Plaintiff to serve the sealed motion upon Defendant.[30]

**C.  <u>Damages Hearing</u>**

On October 14, 2016, the court held a hearing on damages, hearing arguments and testimony related to the amount of damages

---

[24]     See Doc. 26, Ord. Dated Feb. 17, 2016.

[25]     See Doc. 27, Sealed Doc., Decl. of Jason C. Langley.

[26]     See Doc. 28, Joint Status Report.

[27]     See id. ¶¶ 11-12.

[28]     See id. ¶ 14.

[29]     See id. ¶ 13.

[30]     See Doc. 30, Ord. Dated Sept. 14, 2016.

from both parties.[31]  Both parties submitted their post-trial briefs on October 28, 2016.[32]

Langley, in-house counsel for Plaintiff, testified about the corporate structure of Plaintiff, Plaintiff's trademarks, and Plaintiff's damages.  Langley testified about Plaintiff's efforts to protect its trademarks and the facts prompting the filing of the lawsuit.  Langley stated that in 2014, Plaintiff became aware of Defendant's infringement after one of its franchisee-dentists in Houston called Plaintiff and related that some of his patients reported confusion.  This dentist called Defendant, and the person who answered the phone represented that Defendant was the "Clear Choice" from the television advertisements.  This prompted Plaintiff to send two cease-and-desist letters to Defendant. Plaintiff filed this suit after Defendant continued to use the marks.

Langley discussed Defendant's infringing social media and internet presence, including a website owned by Defendant and registered in 2011 with the address "myclearchoicedental.com" and Facebook, Yelp, Google+ and Angie's List pages where Defendant originally used the name "Clear Choice Dental, PLLC." Langley testified that Defendant later changed the name to "Dental Associates of Texas" on some, but not all of these sites.  Langley

---

[31]   See Doc. 32, Minute Entry Ord. Dated Oct. 18, 2016.

[32]   See Doc. 33, Def.'s Post-Trial Brief; Doc. 34, Mem. of Law in Support of Pl.'s Remedies, Attorney's Fees & Costs, & Interest.

said that the last infringing website was not taken down until September 2016.

Langley explained that Plaintiff was concerned about these advertising web pages not only because they infringed on Plaintiff's trademarks but also because they contained negative reviews. These bad reviews included statements such as, "BEWARE . . . I should have checked her reviews before getting my braces at her office" and "STAY AWAY from this clinic. You have been warned."[33] Langley stated that other than web page advertising, he could not determine that Defendant was utilizing any other advertising. Langley stated that Plaintiff believed that Defendant was trading off of Plaintiff's name and causing confusion as a result.

Langley testified that in light of Defendant's actions, Plaintiff was entitled to attorney's fees and costs, treble damages, license fees, management fees, and corrective advertising. Langley stated that in his opinion, Plaintiff was entitled to treble damages because Defendant acted intentionally to cause confusion in the marketplace by representing that it was the entity that advertised on television.

Langley disclosed that Plaintiff's largest annual expense was advertising, and that it would need to increase its spending on advertising in the Houston market if it saw revenues decrease for

---

[33]     Doc. 27, Ex. 12 to Decl. of Langley p. 44; Doc. 27, Ex. 14 to Decl. of Langley p. 55.

the Houston implant center.  Langley further stated that Plaintiff
had not seen the local revenues decline, and he was not aware of
any corrective advertising that Plaintiff had done as of the date
of the hearing that directly addressed the fact that Defendant was
not part of Plaintiff's network.

Langley explained that the dentists in its ClearChoice network
focused on dental implant services almost exclusively.  Langley
stated that Plaintiff's network dentists did not perform root
canals, but performed maintenance services for the implants, such
as cleaning, and also crafted crowns for implant patients.  The
ClearChoice implant centers did not offer general dentistry
services for non-implant patients.

Marcus Hamm ("Hamm"), a certified public accountant familiar
with Defendant's business records, also testified.  Hamm stated
that Defendant provided general dentistry services, and that
Defendant did not have any revenue stream from dental implants,
based on his personal knowledge of Defendant's production reports.
Hamm said that he had prepared Plaintiff's tax returns since 2011
and that he filed the doing-business-as form for Defendant's new
name. He said that Defendant also had formed a new PLLC under its
new name.  Hamm testified that Dr. Matt has requested that the
business name be updated on her lease and has made attempts to
change the name on social media and on its website.  Hamm
additionally testified about Defendant's tax returns from 2012,

2013, and 2014.   Defendant earned gross receipts of $230,891 in 2011 with a net profit of $6,030.   In 2012, Defendant had gross receipts of $291,364 and posted a net profit of $144,254.   In 2013, Defendant earned gross receipts of $91,625 and posted a net loss of ($91,031).   In 2014, Defendant earned $378,457 and declared a $218,461 net profit.   The 2015 return had not been filed as of the date of the hearing.   Hamm stated that Defendant stopped operating as Clear Choice Dental, PLLC in December 2015.   Additionally, Hamm disclosed that Defendant's advertising expenditures were $810 in 2012, $725 in 2013, and $3,790 in 2014.

## II.  Legal Standard

In this circuit, there is a three-step process to obtaining a default judgment pursuant to Federal Rule of Civil Procedure ("Rule") 55: (1) a default; (2) entry of default; and (3) default judgment.   New York Life Ins. Co. v. Brown, 84 F.3d 137, 141 (5th Cir. 1996); Am. States Ins. Co. v. Arete Real Estate & Dev., Civ. No. 3:08-CV-06, 2009 WL 854836, (N.D. Tex. Mar. 30, 2009).   Under Rule 55(a), a default may be entered "when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."   Fed. R. Civ. P. 55(a).   After a default is entered, a default judgment may be entered under Rule 55(b).

Where a claim is for a sum certain or where damages can be

9

made certain by computation, Rule 55(b)(1) allows the clerk to enter a default judgment where that amount is supported by affidavit. See Fed. R. Civ. P. 55(b)(1). In all other cases, the court may conduct a hearing to determine the amount of damages. See Fed. R. Civ. P. 55(b)(2)(B).

The Lanham Act provides for damages in cases where there has been a violation of a validly registered trademark, a violation of Section 1125(a) or (d), or a willful violation of Section 1125(c). 15 U.S.C. § 1117(a). If such violation occurs, a plaintiff is entitled "to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." U.S. for Use of M-CO Const., Inc. v. Shipco Gen. Inc., 814 F.2d 1011, 1014 (5th Cir. 1987). Additionally, the court can assess treble actual damages. Id. In "exceptional cases," the court "may award reasonable attorney fees to the prevailing party." Id. The court shall take into account equitable considerations in deciding the amount of damages. Id. Section 1117 of the Lanham Act "endows the district court with considerable discretion in fashioning an appropriate remedy for infringement." Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1127 (5th Cir. 1991)

### III. Analysis

In this case, Plaintiff seeks damages under the Lanham Act for Defendant's profits, Plaintiff's damages, costs, attorney's fees,

10

pre- and postjudgment interest.[34]  Plaintiff additionally asks the court for treble damages.

## A.  **Statute of Limitations**

Plaintiff asserts that the statute of limitations for trademark infringement is four years, and Defendant does not dispute this fact in its post-hearing brief to the court.

The Lanham Act does not specify a statute of limitations. Mary Kay, Inc. v. Weber, 601 F. Supp.2d 839, 859 (N.D. Tex. 2009). Courts, therefore, look to state statute of limitations in order to determine the statute of limitations under the Lanham act. Derrick Mfg. Corp. v. Southwestern Wire Cloth, Inc., 934 F.Supp. 796, 804 (S.D. Tex. 1996).  District courts in Texas and elsewhere have found that the proper state statute of limitations to apply to these claims is that for fraud claims.  Id. ("The large majority of federal courts that have considered the limitations issues as to Section 43(a) claims have held that these claims are most comparable to fraud claims, and have applied the fraud limitations period)(gathering cases); Reservoir, Inc. v. Truesdell, No. 4:12-CV-2756, 2013 WL 5574897, at *5 & n.9 (S.D. Tex. Oct. 9, 2013)(unpublished); Mary Kay, Inc. v. Weber, 601 F. Supp.2d 839, 859-60 (N.D. Tex. 2009); Edmark Indus. SDN BHD v. South Asia Int'l. (H.K.) Ltd., 89 F. Supp.2d 840, 846 (E.D. Tex. 2000).  Under Texas

---

[34]     In its complaint, Plaintiff also asserts claims under Texas state law for trademark infringement and unfair competition. However, in its brief seeking damages, Plaintiff has not asked for any damages under Texas law for these claims.  Therefore, the court considers those claims abandoned.

law, the statute of limitations for fraud claims is four years. Tex. Civ. Prac. & Rem. Code § 16.004(a).  The court will apply a four-year statute of limitations to the present case.

**B.  Plaintiff's Damages**

Plaintiff has requested damages for lost licensing fees, lost management fees, and corrective advertising.

**1.  Lost Licensing and Management Fees**

The Fifth Circuit has held that in order to receive monetary damages there does not have to be a finding of actual confusion. Taco Cabana, 932 F.2d at 1126 (citing Boston Prof'l. Hockey Ass'n. Inc. v. Dallas Cap & Emblem Mfg., 597 F.2d 71, 75-76 (5th Cir. 1979); Shen Mfg. Co. v. Suncrest Mills, Inc., 673 F. Supp. 1199, 1206 (S.D.N.Y. 1987).  The Fifth Circuit has supported awards by the district court for lost profits, lost income, and lost licensing fees.  Taco Cabana, 932 F.2d at 1126 (affirming a jury's award of $306,000 for lost profits and $628,300 for lost income); Boston Prof'l Hockey, 597 F.2d at 75 (awarding damages because "plaintiffs were deprived of the economic benefits they normally would have received by licensing the use of their marks").

Plaintiff seeks licensing fees from Defendant in the amount of $1,830,000, with a $30,000 per month increase for every month that Defendant continues to infringe on Plaintiff's trademarks.  This represents Plaintiff's usual monthly licensing fee, applying a four-year statute of limitations, commencing four years back from

the date the lawsuit was filed, December 15, 2014, and calculating it forward through February 2016. Plaintiff stated that this amount would increase by $30,000 for each month Defendant continued the infringement.

Plaintiff additionally seeks lost management fees of $4,854,568, calculating this amount by looking at management fees paid by its Houston location. In 2014, Langley averred that this location paid, on average, $89,367 per month in management fees, and in 2015, Langley averred that this location paid, on average, $69,798.50 per month in management fees through October 2015. Plaintiff averaged these numbers to find that it earned $79,583.09 per month from the Houston location during the recent infringing period. It then multiplied this average by the number of months from December 15, 2010 to February 2016, cautioning that the amount would increase by $79,583.09 per month as the infringement continued past October 2015.

Defendant concedes that the law permits Plaintiff to seek damages for lost licensing and management fees. However, Defendant argues that the lost licensing and management fees requested by Plaintiff are not reasonable under the circumstances. The court agrees.

Here, Defendant operates a general dentistry practice, while Plaintiff specializes solely in dental implants, a highly lucrative, niche practice, as evidenced by the ability to pay

13

$30,000 per month in licensing fees and approximately $75,000 per month in management fees to Plaintiff. As outlined in Hamm's testimony, Defendant earned an average net profit of $69,428.50[35] from 2011 to 2014. This yearly average is less than what Plaintiff believes it is entitled to for a month of its licensing and management fees. Defendant did not offer implant services, therefore did not directly compete with Plaintiff's niche practice. Additionally, as Defendant argues, Defendant never received any benefits of management services from Plaintiff. Therefore, the court finds that Plaintiff's requested damages for licensing and management fees are inappropriate given the circumstances of this case.

## 2. Corrective Advertising

Courts in other circuits have supported the notion that a plaintiff may recover damages under the Lanham Act to pay for corrective advertising. See e.g., Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 1374-75 (10th Cir. 1977); Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 506 (7th Cir. 1992); Adray v. Adry-Mart, Inc., 76 F.3d 984, 988-89 (9th Cir. 1995); Zelinski v. Columbia 300, Inc., 335 F.3d 633, 640-41 (7th Cir. 2003). The purpose of corrective advertising is to "counteract the public confusion resulting from a defendant's [trademark

---

[35] This was calculated by adding up the net profits and losses from 2011 to 2014, using the numbers provided by Defendant, and then dividing them by four to obtain the average net profit for those four years.

infringement]." <u>Big O Tire Dealers</u>, 561 F.2d at 1374-75.   The Fifth Circuit did uphold a district court's remedy of corrective advertising in <u>Taco Cabana</u>, finding that it was not punitive. 932 F.2d at 1126.   However, in <u>Taco Cabana</u>, the remedy of corrective advertising was for injunctive relief, not damages.   <u>Id.</u>

Corrective advertising damages can include costs that have already been spent pre-trial to engage in corrective advertising, or prospective corrective advertising.   <u>Adray</u>, 76 F.3d at 988. Prospective corrective advertising is "the amount [the plaintiff] would be required to spend in the future to dispel the confusion caused by defendant's infringement."   <u>Id.</u>   In calculating the amount of corrective advertising damages, courts have cited the Federal Trade Commission's ("FTC") twenty-five percent rule for corrective advertising cases.   <u>Big O Tire Dealers</u>, 561 F.2d at 1375-76.   This rule reduces damages by seventy-five percent for corrective advertising, following the FTC's "determination that a dollar-for-dollar expenditure for corrective advertising is unnecessary to dispel the effects of confusing and misleading advertising." <u>Id.</u> at 1376.   The Ninth Circuit held that if damages are awarded for corrective advertising, they should not be greater than the mark itself.   <u>Adray</u>, 76 F.3d at 989.

Plaintiff seeks corrective advertising damages in the amount of $700,000 for this case.   Plaintiff calculated this amount by adding up the amount it spends nationwide in internet ads, national

cable ads, and on social media for a year. Plaintiff then divided
that amount by eighteen because Plaintiff is found in eighteen
different states. Plaintiff added these three numbers plus the
amount it spends on Houston advertising, which resulted in a total
of $1,792,681.55, and then applied the FTC's twenty-five percent
rule, which resulted in an amount of $448,170.39. Plaintiff
requested $700,000 from the court. Defendant argues that damages
for corrective advertising are inappropriate because there is no
evidence that Plaintiff has undertaken corrective advertising or
that Plaintiff plans to undertake corrective advertising in the
future.

The court finds that an award of damages for corrective
advertising is not warranted in this case. Plaintiff has done no
corrective advertising and has no plans to do so. The court finds
that awarding damages for speculative corrective advertising would
be punitive, rather than compensatory.

## C. **Defendant's Profits**

Recovery of a defendant's profits is allowed in certain
situations under the Lanham Act, and the Act itself provides a
formula for calculating them. 15 U.S.C. § 1117. The statute
states, "[i]n assessing profits the plaintiff shall be required to
prove defendant's sales only; defendant must prove all elements of
cost or deduction claimed." Id. This provision means that a
plaintiff must prove defendant's sales in order to determine a

16

defendant's profits, and if a plaintiff can prove a defendant's sales, then the defendant has the burden to prove any costs or deductions it claims.   Am. Rice, Inc. v. Producers Rice Mills, Inc., 518 F.3d 321, 337 (5th Cir. 2008).

The Fifth Circuit has held that the remedies under Section 1117(a) "are awarded subject to the principles of equity, and thus, an award of the defendant's profits is not automatic." Am. Rice, 518 F.3d at 338 (citing Quick Tech., Inc. v. Sage Grp. PLC, 313 F.3d 338, 349 (5th Cir. 2002)).   When looking at whether or not to award defendant's profits under Section 1117(a), courts look to the following non-exclusive list of factors, "(1) whether the defendant has the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." Am. Rice, 518 F.3d at 338 (citing Quick Tech., 313 F.3d at 349).   If the court decides to award defendant's profits, the plaintiff is "entitled to only those profits attributable to the unlawful use of its trademark." Seatrax v. Sonbeck Int'l., Inc., 200 F.3d 358, 369 (5th Cir. 2000).

In this case, Defendant has recently provided the court with evidence from Dr. Matt's tax returns, showing the amount of annual

net profit Defendant made from 2011 to 2014.[36]   Plaintiff argues that it should receive all of Defendant's revenues from 2011 to 2015 because the six factors cited above have been met in this case.  Plaintiff further argues that Defendant's evidence as to the costs or expenses of the business was not reliable because Defendant's accountant did not have personal knowledge about the details of the expenses.   Defendant counters that the court has discretion in awarding damages based on Defendant's profits, and cautions that the court can only award as damages those profits related to the trademark infringement.

The first factor under the test is whether the defendant had the intent to confuse or deceive.  Here, the court finds that defendant had such intent.  Defendant's employee was heard to tell a potential client who called that it was the ClearChoice from the television ads, when it ran no television ads.  Additionally, Defendant continued its use of the infringing marks after receiving cease-and-desist letters and after having a lawsuit filed against it.

With regard to the second factor of the test, there is no evidence that sales have been diverted from Plaintiff to Defendant as a result of the trademark infringement.  Plaintiff has not provided evidence demonstrating a drop in its sales since Defendant began infringing upon its trademarks.  Additionally, there is no

---

[36]   See Doc. 33, Ex. A to Def.'s Post-Trial Brief, Summary of Def.'s Income & Expenses.

evidence that Defendant has revenue stream from dental implants. The evidence provided by Defendant's accountant indicates that Defendant does not earn revenue from dental implants, whereas this is the main service Plaintiff offers.

The third factor, adequacy of other remedies, looks at whether another remedy, such as an injunction, would cure the trademark infringement issues. The court recommends here that a permanent injunction be granted in Plaintiff's favor, which would solve the problems with confusion and negative reviews that Defendant's use of Plaintiff's mark has possibly caused.

The fourth factor asks whether Plaintiff unreasonably delayed in asserting its rights. The court finds that Plaintiff acted in a timely fashion in asserting its rights. From Langley's testimony, it is clear that Plaintiff acted diligently in policing its trademarks and began asserting its rights soon after it learned of the infringement, beginning with sending Defendant cease and desist letters, and then soon filing a lawsuit after it was clear Defendant was continuing to use the infringing marks.

The fifth factor asks if there is a public interest in making Defendant's conduct unprofitable, which the court finds there is in this case. It is unfair to the public that Defendant would associate itself with a national brand well-known for its dental implants when this is not a service that Defendant actually performs. The public has an interest in truthful advertising.

Under the sixth factor, the court must examine whether it is a case of palming off.  Palming off "occurs when a producer misrepresents his own goods or services as someone else's."  Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 27 & n.1 (2003).  The evidence provided shows that Defendant misrepresented that it was Plaintiff in a phone call with potential client. Additionally, Defendant utilized Plaintiff's name on its social media and website.  The court finds that Defendant's trademark infringement misrepresented its services as Plaintiff's.

Here, the court finds that because most factors were met, other than the second factor related to diversion of sales, an award of Defendant's profits is proper in this case.  However, the court finds that the amount requested by Plaintiff is excessive in light of Defendant's modest revenues and because Defendant's profits come from acting as a general dentist, not as an implant specialist such as Plaintiff.  Therefore, the court finds an award of $70,000, representing one year of Defendant's profits is proper in this case.

## D.  **Costs of the Action**

A plaintiff may be awarded the costs of the action under the Lanham Act.  15 U.S.C. § 1117(a); Fed. R. Civ. Pro. 54(d)(1).  28 U.S.C. § 1920 lists the ordinary costs that a party can recover. 28 U.S.C. § 1920.  The court finds an award of costs appropriate in this action and accordingly grants Plaintiff's request to submit a

bill of costs after judgment is entered.

## E.  **Attorney's Fees**

In exceptional cases, the court may award attorney's fees to the prevailing party. 15 U.S.C. § 1117(a).  The plaintiff has the burden of proof to show that a case is "exceptional" by clear and convincing evidence. Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1390 (5th Cir. 1996).  A trial court has discretion to determine whether a case is exceptional. Id.

The Lanham Act does not directly define the meaning of "exceptional cases," but the legislative history provides greater insight into the meaning of the term. See 15 U.S.C. § 1117; Moore Bus. Forms, Inc. v. Ryu, 960 F.2d 486, 491 (5th Cir. 1992). According to the Senate Report, "the remedy should be available in exceptional cases, i.e., in infringement cases where the acts of infringement can be characterized as 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.'" Moore, 960 F.2d at 491 (citing S.Rep. No. 1400, 93rd Con. 2d Sess., reprinted in U.S. Code Cong. & Admin. News 7132, 7133 (1974)).

Courts have interpreted this provision of Section 1117(a) "to require a showing of a high degree of culpability on the part of the infringer, for example, bad faith or fraud." Tex. Pig Stands, Inc. v. Hard Rock Cafe Intern., Inc., 951 F.2d 684, 694 (5th Cir. 1992).  "[A] few cases have gone as far as to require 'very egregious conduct' to constitute an 'exceptional case.'" Seven-Up,

86 F.3d at 1390 (citing <u>Tex. Pig Stands</u>, 951 F.2d at 696-97 & n.25).

Economic status of the parties should not play into the court's decision in finding that it is an exceptional case. <u>Tex. Pig Stands</u>, 951 F.2d at 697. Furthermore, a finding of willfulness on the Defendant's part does not automatically make it an exceptional case, but it can inform the court in its determination. <u>Id.</u>

Plaintiff has failed to meet its burden to show that this is an exceptional case. Plaintiff has not provided clear and convincing evidence of bad faith or fraud on the part of Defendant. Although the evidence demonstrates that Defendant traded off and infringed upon Plaintiff's trademarks, the court does not find that Defendant's actions rise to the level of an exceptional case. Therefore, the court finds that attorney's fees should not be awarded.

## F.  <u>Treble Damages</u>

The Lanham Act allows for up to three times actual damages, but trebling the damages cannot act as a penalty. 15 U.S.C. § 1117(a) ("In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount."). A finding of willfulness can help support enhanced damages. <u>Taco Cabana</u>, 932 F.2d at 1127. In <u>Taco Cabana</u>, the court

22

found that "it is anomalous to say that an enhancement of damages, which implies an award exceeding the amount found 'compensatory,' must be 'compensatory' and not 'punitive.' Id. Enhanced damages are to be used to "provide proper redress to an otherwise undercompensated plaintiff where imprecise damage calculations fail to do justice, particularly where the imprecision results from defendant's conduct." Id.

Plaintiff has requested treble damages in this action. However, the court does not find that an award of treble damages is appropriate here because the court believes that treble damages would be punitive, not compensatory. Defendant only averaged a net profit of less than $70,000 over the past four years. Plaintiff has failed to show that its business has been damaged by Defendant's infringement, especially when coupled with the fact that the nature of the two businesses is very different. Accordingly, the court believes Plaintiff will be adequately compensated by the damages awarded herein by the court and will not award Plaintiff enhanced damages.

G. **Interest**

The Lanham Act does not explicitly state that a plaintiff can recover prejudgment interest. See 15 U.S.C. § 1117. Plaintiff has requested prejudgment interest at the rate in 26 U.S.C. § 6621(a)(2) and post-judgment interest under 28 U.S.C. § 1961(a). Circuit courts are in agreement that prejudgment interest can be

awarded by district courts in trademark cases. See Clearline Tech. Ltd. v. Cooper B-Line, Inc., 948 F.Supp.2d 691, 712 (S.D. Tex. 2013)(citing 1 McCarthy on Trademarks and Unfair Competition § 30:93). Disagreement arises among the circuits as to when district courts can award a plaintiff with prejudgment interest in a trademark case. Clearline, 948 F.Supp.2d at 712.

The Fifth Circuit has not decided when courts can award prejudgment interest in trademark cases. Id.; Exxon Mobil Corp. v. Exxonmobil for Export, Import, & Trade Ltd., No. 3:12-CV-01122-P, 2013 WL 12124589, slip. op. at 5 (N.D. Tex. Aug. 23, 2013). The Second Circuit has taken a conservative approach and only awards prejudgment interest in "exceptional" cases. Am. Honda Motor Co., Inc. v. Two Wheel Corp., 918 F.2d 1060, 1064 (2d Cir. 1990). The Seventh Circuit has taken an approach which holds that "prejudgment interest should be presumptively available to victims of federal law violations. Without it, compensation of the plaintiff is incomplete and the defendant has an incentive to delay." Gorenstein Enters., Inc. v. Quality Case-USA, Inc., 874 F.2d 431, 436 (7th Cir. 1989). The Tenth Circuit is in line with the Seventh Circuit's approach, holding that "prejudgment interest should normally be awarded in successful federal claims. United Phosphorus, Inc. v. Midland Fumigant, Inc., 205 F.3d 1219, 1236-37 (10th Cir. 2000).

Courts ruling on this issue in the Fifth Circuit have elected

to follow the Seventh and Tenth Circuit's approach, finding it to be more persuasive than the approach of the Second Circuit. Clearline, 948 F.Supp.2d at 713 ("The Court is persuaded by the Seventh Circuit's reasoning that pre-judgment interest should be awarded in most cases"); ErgoBilt, Inc. v. Neutral Posture Ergnomics, Inc., No. Civ.A. 397CV2548L, 2004 WL 1041586, at *11 (N.D. Tex. May 6, 2004)(awarding prejudgment interest); Exxon Mobil, 2013 WL 12124589 at *5 ("The Court finds the Seventh and Tenth Circuits' reasoning persuasive.  Prejudgment interest should be presumptively available to victims of federal violations.").  In Exxon Mobil, the court found "the award of prejudgment interest [to be] especially appropriate because the Defendant has delayed the suit, to the Plaintiffs' detriment, by failing to file an answer or even seek proper counsel."  Id.  It found that it would award interest even under the Second Circuit's standard because the case was "exceptional."  Id.

The court believes following the approach of the Seventh and Tenth Circuits to be persuasive and appropriate in this case.  The court finds that, like in Exxon Mobil, it is especially appropriate to award pre-judgment interest because the lawsuit has been unnecessarily delayed by Defendant's long-standing infringement and its failure to defend this action.

Plaintiff requests a prejudgment interest rate as stated in 26 U.S.C. § 6621(a)(2), the rate applicable to the underpayment

payment of taxes, which is the Federal short-term rate plus three percentage points.  Other courts have chosen to award prejudgment interest at the prime rate or Treasury bill rate.  See, e.g., z4 Techs., Inc. v. Microsoft, Inc., No. 6:06-CV-142, 2006 WL 2401099, at *26-27 (E.D. Tex. 2006)(patent case applying the prime rate for prejudgment interest); Clearline Tech., 948 F.Supp.2d at 713-14 (citing Gorenstein and stating that "[t]he Gorenstein court advised district courts to use the prime rate for fixing pre-judgment interest cases where no statutory interest rate governs.").

The court finds the Clearline Tech reasoning to be persuasive. Prejudgment interest shall run at the average monthly prime rate from December 15, 2010, to the date judgment is entered.[37]

Plaintiff is entitled to post-judgment interest under 28 U.S.C. § 1961(a), which states that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a).  The final judgment shall reflect post-judgment interest.

## IV.  Injunctive Relief

Under the Lanham Act, district courts are given the power to "issue injunctions according to the principles of equity and upon

---

[37] Per the Federal Reserve, the prime rate was 3.25 percent from January 2010 to November 30, 2015.  In December 2015 it was 3.37 percent, and from January 2016 to December 14, 2016 it was 3.5 percent.  The current rate is 3.75 percent, effective December 15, 2016.  See https://www.federalreserve.gov/datadownload/Preview.aspx?pi=400&rel=H15&preview =H15/RIFSPBLP_N.M.  The court's calculation of this monthly average rate is 3.29 percent.

such terms as the court may deem reasonable to prevent the violation of any right of the registrant of a mark." Liberto v. D.F. Stauffer Biscuit Co., Inc., 441 F.3d 318, 329 (5th Cir. 2006). "To be entitled to a permanent injunction, a party must show: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for the injury; (3) that, considering the balance of hardships between the plaintiff and defendant, an equitable remedy is warranted; and (4) that the public interest would not be disserved by the permanent injunction." Abraham v. Alpha Chi Omega, 708 F.3d 614, 627 (5th Cir. 2013)(citing eBay Inc. v. MercExchange, LLC, 547 U.S. 388 (2006)).

Because of the default judgment, the first prong of the test is met. See id. ("the entry of default is tantamount to actual success on the merits and satisfies the first prong of the test—that Plaintiff has suffered an actual injury."). The court turns to the second element, the inadequacy of remedies to fix the injury. In Abraham, the Fifth Circuit quoted a treatise in relation to the second factor, stating "there seems little data that money damages are 'inadequate' to compensate [owner] for acts of [infringer]." Abraham, 708 F.3d at 627 (citing 5 McCarthy on Trademarks and Unfair Competition § 30:2 (4th ed. 2001).

While it appears that Defendant has stopped using the name to some extent, it is not clear whether all use of the name has ceased

27

at this point in time.  Looking at the final two factors relating to the balance of hardships, Defendant and the public will not be harmed if Defendant is forced to stop using the marks.  In fact, stopping Defendant from using the mark will help to clear up any confusion that Defendant's infringement has caused.

"'[T]he scope of injunctive relief is dictated by the extent of the violation established' . . . . The district court must narrowly tailor an injunction to remedy the specific action which gives rise to the order." John Doe #1 v. Veneman, 380 F.3d 807, 818 (5th Cir. 2004)(quoting Califano v. Yamasaki, 442 U.S. 682, 702 (1979)).

In its complaint, Plaintiff sought a permanent injunction, asking for the following: (1) that Defendant stop using the same Clear Choice Dental, PLLC; (2) that Defendant stop operating the domain name www.myclearchoicedental.com and transfer it to Plaintiff; (3) that Defendant hand over any materials for destruction that contain the name Clear Choice Dental, PLLC; and (4) to de-register Clear Choice Dental, PLLC, with the Texas Secretary of State.  The court finds that all of these are narrowly tailored, as they will help prevent Defendant from further infringing on Plaintiff's trademarks.  A permanent injunction including these elements should be included in the final judgment.

## V.  Conclusion

Based on the foregoing, the court **RECOMMENDS** awarding

28

Plaintiff $70,000 in damages, with pre-judgment interest accruing at the rate of 3.29 percent from December 15, 2010, through the date of the final judgment, and post-judgment interest accruing thereafter. Additionally, the court **RECOMMENDS** that Plaintiff's application for a permanent injunction be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this _23rd_ day of December, 2016.

_____
NANCY K. JOHNSON
U.S. MAGISTRATE JUDGE